# PROSKAUER ROSE LLP

LOS ANGELES
WASHINGTON
1585 Broadway          BOSTON
New York, NY 10036-8299   BOCA RATON
Telephone 212.969.3000    NEWARK
Fax 212.969.2900          NEW ORLEANS
                          PARIS

**Hank L. Goldsmith**
Member of the Firm

Direct Dial 212.969.3418
hgoldsmith@proskauer.com

September 24, 2007

**USDS SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 9-25-07**

SEP 2 4 2007

CHAMBERS OF
JUDGE MARRERO

**By Hand**

Hon. Victor Marrero
United States District Judge
United States District Court for the
Southern District of New York
United States Courthouse, Ste. 660
500 Pearl Street
New York, New York 10007

> Re:   Flight Sciences, Inc. v. Cathay Pacific Airways Limited
>       07 Civ. 2830 (VM) (ECF Case)

Dear Judge Marrero:

We represent plaintiff Flight Sciences, Inc. ("Flight Sciences") in this action against defendant Cathay Pacific Airways Limited ("Cathay Pacific"). The parties submit this joint letter for your Honor's rulings pursuant to your Honor's individual Rule III. For the sake of context in considering the issues set forth below, the parties attach copies of the Complaint, Answer, and Reply to Counterclaim, as well as the discovery requests at issue, and below, after a brief respective overviews of the present discovery dispute.

## Flight Sciences' Brief Overview[1]

This action arises from Cathay Pacific's (or "CPAL's," as it is referred to in the Complaint, excerpted below) usurpation of Flight Sciences' fuel conservation work for Cathay Pacific. As alleged in Flight Sciences' Complaint, after working together for years pursuant to the parties' Agreement, Cathay Pacific claimed to Flight Sciences that it would not agree to or implement certain of Flight Sciences' recommendations but thereafter, in secret, Cathay Pacific used at least some of the recommendations (we currently know of at least two; the discovery at

---

[1] The parties are simultaneously exchanging their sections of the letter; accordingly, the parties have not had an opportunity to review each other's recitation of the facts, and each reserves all rights in connection therewith.

PROSKAUER ROSE LLP

Hon. Victor Marrero
September 24, 2007
Page 2

issue will reveal the others), and now stands to reap (or has reaped) millions of dollars in benefits through such use. (*See generally* Complaint ¶¶ 26-46.) Plainly, Cathay Pacific was not dealing in good faith with Flight Sciences, as was revealed when, for example, it falsely proclaimed that its employees had "come up" with two very specific fuel conservation strategies (polished fuselages and lightweight ULD's) that Flight Sciences previously presented to Cathay Pacific but which Cathay Pacific "rejected." (*See* Complaint ¶¶ 36-39). It is time for Cathay Pacific to be held accountable for its action.

Having been caught in at least two instances of concealment and commercial misappropriation, defendant Cathay Pacific now resists discovery regarding the exact nature of its wrongdoing.[2]

As the Court will see below, however, Cathay Pacific, which answered the Complaint (*i.e.,* it did not move to dismiss), now opposes discovery essentially on the grounds that *its* theory of the case is the one that should ultimately prevail and that *its* theory does not require it to provide discovery. That position is unsupported in the law. The case is in the discovery phase and Cathay Pacific must comply; it cannot unilaterally resist discovery merely by relying on a view of the case that differs from the case as framed in the pleadings. *See, e.g., United States v. 216 Bottles,* 36 F.R.D. 695, 699-700 (E.D.N.Y. 1965) (Bartels, J.) ("To adopt the claimant's suggestion that these interrogatories should be stricken . . . is to decide that issue before discovery proceedings or trial. Upon a motion addressed to interrogatories, the Court has no authority to make such a decision. . . . *Moreover, the [party seeking discovery] is entitled to inquire and to examine upon its theory of the facts and law of the case and is not limited to the [party resisting discovery's] theory. . . .* ") (citations omitted) (emphasis and material in brackets added).

By way of background, Flight Sciences' Complaint alleges that "On or about April 17, 1997, Flight Sciences and CPAL entered into a written agreement pursuant to which Flight Sciences was engaged to undertake an analysis of CPAL's operations and make fuel conservation recommendations to CPAL (the 'Agreement'). The Agreement expressly recited the understanding and agreement of the parties that Flight Sciences had 'considerable skill, knowledge and experience in the analysis of airline fuel consumption and conservation giving it

---

[2] Plaintiff Flight Sciences has been appropriately active regarding discovery (serving its detailed document requests before the July conference with the Court), and defendant Cathay Pacific (which served neither its initial document responses nor interrogatory responses on time) has been lagging. Indeed, this letter was only finally submitted after much discussion (including a lengthy meet and confer letter that Flight Sciences wrote to Cathay Pacific on September 11, 2007 about the issues herein but as to which no substantive response came), after Flight Sciences informed Cathay Pacific last week that it was about to go to Court to inform the Court that Cathay Pacific was not participating in the meet and confer process. Cathay Pacific has given incomplete discovery, detailed below, agreed to make one witness (only) available in September, and has asked for two informal telephone conferences with Flight Sciences, which Flight Sciences agreed to in an effort to move forward, but which proved to be valueless and at the end of the day seemed to eat up the clock more than anything else.

**PROSKAUER ROSE LLP**

Hon. Victor Marrero
September 24, 2007
Page 3

significant knowledge and know how in that area' and that '[i]n reliance upon such skill, knowledge and experience [CPAL] desire[d] to engage [Flight Sciences] to provide certain services (including analysis) with respect to airline fuel consumption and conservation. . . .'" (Complaint ¶¶ 22-23).

Complaint ¶ 27 alleges that "Flight Sciences made fuel conservation recommendations to CPAL that, when implemented, would enable CPAL to achieve and exceed the threshold in the Agreement. Agreement sections 5.1 and 5.2 specify the compensation that Cathay Pacific was to pay to Flight Sciences for its work. (*See* Complaint ¶¶ 24-27). Under those paragraphs, the parties were to agree to reasonably projected savings for the fuel conservation strategies offered by Flight Sciences (which agreement was not to be unreasonably withheld, *see* Agreement section 6.4), and if the savings achieved certain thresholds, Flight Sciences was to be paid certain percentages of the projected savings for a period of three years.

Paragraph 5.2 of the Agreement provided that in addition to the initial retainer and fee specified in Paragraph 5.1, Cathay Pacific would pay Flight Sciences an amount equal to a specified percentage of the agreed projected net cost savings to Cathay Pacific arising from net fuel consumption savings attributable to implementation of the fuel conservation measures made by Flight Sciences, as follows:

> A.    for the twelve months commencing from the date upon which the recommendations of [Flight Sciences] following conclusion of the Project are accepted by CPAL, an amount equal to 5% of the agreed projected net cost savings for CPAL arising from the net fuel consumption savings attributable to implementation of the fuel conservation recommendations of [Flight Sciences];
>
> B.    for the twelve months commencing on the expiry of the 12 month period referred to in paragraph (i) above, an amount equal to 2 ½ % of the agreed projected net cost savings for CPAL arising from the net fuel consumption savings attributable to the implementation of the fuel conservation recommendations of [Flight Sciences]; and
>
> C.    for the twelve months commencing on the expiry of the 12 month period referred to in paragraph (ii) above, an amount equal to 1% of the agreed projected net cost savings arising for CPAL arising from the net fuel consumption savings attributable to the implementation of the fuel conservation recommendations of [Flight Sciences]."

In 1997, when the Agreement was executed, Cathay Pacific paid Flight Sciences a $150,000 retainer, which it never sought back. (*See, e.g.*, FSI 0000072-73). Flight Sciences thereafter performed work and made numerous specific recommendations to Cathay Pacific, and for a period of years the parties discussed the specific recommendations that Flight Sciences had

**PROSKAUER ROSE LLP**

Hon. Victor Marrero
September 24, 2007
Page 4

made. Cathay Pacific began a program that, in retrospect, seems to have been designed to have the effect of taking what Flight Sciences was offering, while feigning rejection or disinterest (so as to avoid further compensating Flight Sciences pursuant to the Agreement). As noted above, however (Complaint ¶¶ 36-39), since that time, at least two appropriations by Cathay Pacific of Flight Sciences' recommendations – recommendations which were purportedly "rejected" such that Cathay Pacific refused to agree on their respective projected savings -- came to light.[3]

As demonstrated above, under the relevant authorities the issue of whether Cathay Pacific's theory of the case is correct, or Flight Sciences' theory of the case is correct, is <u>not</u> the issue before the Court at this point. The issue at this point is simply compelling Cathay Pacific to make disclosure as provided for under the Federal Rules.

## Cathay Pacific's Brief Overview

The parties entered into a Fuel Conservation Consulting Agreement (the Agreement) on April 17, 1997. Cathay Pacific paid plaintiff $150,000. Under the terms of the contract, if Flight Sciences made fuel saving recommendations to Cathay Pacific, and if those recommendations were accepted and resulted in net fuel savings to Cathay Pacific, Flight Sciences was to receive additional compensation.

Flight Sciences made twenty-nine recommendations to Cathay Pacific. The parties met to discuss the recommendations in June of 1998 and on July 7, 1999, Cathay Pacific wrote to Flight Sciences, accepting fourteen of the recommendations, advising that eight of the others were under consideration, and rejecting seven of the recommendations. The projected net fuel savings based on the accepted recommendations were $3,015,000, far below savings required under the Agreement to trigger any additional financial liability from Cathay Pacific to Flight Sciences.

Cathay Pacific's letter was never responded to by Flight Sciences and on August 16, 2000, Captain Jeff Turner of Cathay Pacific advised Flight Sciences that "there is little enthusiasm here for a continued relationship between Flight Sciences and Cathay Pacific Airways". There was

---

[3]    In January 2000, with the Agreement still in effect, Cathay Pacific suggested that the parties could, *inter alia,* either "[c]ontinue the current arrangement," or "[f]ormally terminate the agreement. . ." (Letter from Cathay Pacific's Jeff Turner to Flight Sciences dated January 17, 2000 [CP 000007]). There was no formal termination thereafter; instead, Cathay Pacific apparently intends to rely on an August 16, 2000 letter it produced wherein its representative Turner commented that "I *feel* there is *little enthusiasm* here for a continued relationship" between the companies. (CP 000005, emphasis added). Based on its recent statements, Cathay Pacific apparently intends to claim that Capt. Turner's report of his "feelings" were akin to a <u>formal termination</u> under the Agreement, but the letter certainly did not say that. This is an after-the-fact construct by Cathay Pacific. Moreover, in response to Cathay Pacific's Interrogatory No. 20 inquiring when Flight Sciences "consider[ed] the 'Project [to be] completed' as stated in the Fuel Conservation Consulting Agreement," Flight Sciences specifically asserted that the Agreement had <u>not</u> "been completed, because Defendant has not performed as required under the Agreement." Accordingly, Cathay Pacific's attempt unilaterally to limit discovery is inappropriate.

PROSKAUER ROSE LLP

Hon. Victor Marrero
September 24, 2007
Page 5

no further contact between the parties concerning the Agreement (except for an exchange of letters in 2001 concerning Flight Sciences' invitation to Cathay Pacific to attend a User Conference that on fuel savings in Switzerland that Flight Sciences was planning to organize) until June 19, 2006 when, after having seen Cathay Pacific press releases, Flight Sciences wrote to Cathay Pacific that as two of the recommendations which had been rejected by Cathay Pacific in 1999, *i.e.*, the feasibility of polishing aircraft rather than painting them to save fuel and the use of lighter weight cargo containers, had now been accepted by Cathay Pacific, Flight Sciences was entitled to compensation based on the adoption by Cathay Pacific some seven years later of those recommendations. Cathay Pacific rejected the claim made by Cathay Pacific on July 27, 2006. The lawsuit was commenced in April of 2007.

While the Complaint is quite specific that Flight Sciences claimed to be entitled to compensation for fuel conservation measures that had been rejected by Cathay Pacific but later accepted (see paragraphs 31 and 34 of the Complaint), the discovery sought in this case is far broader: it essentially seeks to revisit everyone of the recommendations which were accepted by Cathay Pacific in 1999 but which were determined not to have given rise to net fuel savings such as would trigger liability on the part of Cathay Pacific, as well as seeks discovery on every fuel saving initiative undertaken by Cathay Pacific over the last fifteen years. The discovery is far beyond the scope of the issues raised in the Complaint and seeks to obscure the true issue in this case: whether the parties had completed their contractual obligations in July of 1999, had abandoned any further contractual dealings with each other and whether the airline is obligated to pay for fuel savings recommendations that it had rejected in 1999 but later adopted in 2006 based on improvements in the industry with respect to the availability of lighter weight container composite materials and whether polishing nineteen of the hundred and six aircraft in Cathay Pacific's fleet rather than painting them would produce any net fuel savings.

I.

## DOCUMENT REQUESTS TO CATHAY PACIFIC

Cathay Pacific has objected to producing the below categories of documents, the discovery of which Flight Sciences asserts is necessary for its prosecution of this action and which documents (and related information) are discoverable under the Federal Rules of Civil Procedure. The parties seek the Court's assistance in resolving their dispute.[4]

---

[4] The current discovery cut off is November 24, 2007. In addition, Flight Sciences will be taking the deposition of one of Cathay's 30(b)(6) designees, Capt. Jeff Turner, in New York on September 28, 2007. Cathay Pacific has stated that Capt. Turner will not be available again until January. In order to be in a position to depose Capt. Turner as effectively as possible, Flight Sciences seeks a ruling at this time, while necessarily reserving all of its rights with respect to the deposition of Capt. Turner.

PROSKAUER ROSE LLP

Hon. Victor Marrero
September 24, 2007
Page 6

The first set of requests deal with (a) the price of fuel paid by Cathay Pacific and its subsidiaries; (b) the consumption of fuel by Cathay Pacific and its subsidiaries; and (c) fuel consumption/conservation strategies of Cathay Pacific and its subsidiaries.

**Request No. 8:**

**Documents sufficient to show the cost of fuel for CPAL and its subsidiaries, respectively, for each year from 1992 to the present, quantified in terms of amounts, and as a percentage of overall costs for such entities.**

**Request No. 10:**

**Each document concerning any changes in the fuel efficiency of CPAL and its subsidiaries from April 1, 1992 to the present.**
**Request No. 13:**

**Each document concerning the savings from any fuel conservation strategy implemented by CPAL or its subsidiaries from April 1, 1992 to the present.**

**Request No. 14:**

**Each document concerning the savings projected for any fuel conservation strategy implemented by CPAL or its subsidiaries from April 1, 1992 to the present.**

**Request No. 15:**

**Each document concerning each proposal (whether generated internally by CPAL or its subsidiaries or any other person or entity, including a consultant) relating in whole or part to fuel conservation prepared by, or for, CPAL or its subsidiaries from April 1, 1992 to the present, including any studies, requests, reports, recommendations, suggestions, or any communications relating thereto.**

**Request No. 16:**

**Each document concerning any fuel conservation strategy considered by CPAL or its subsidiaries from April 1, 1992 to the present.**

**Request No. 17:**

**Each document concerning each fuel conservation strategy implemented by CPAL or its subsidiaries from April 1, 1992 to the present.**

PROSKAUER ROSE LLP

Hon. Victor Marrero
September 24, 2007
Page 7

Cathay Pacific objected to these Requests as "overbroad, as not relevant to the claim of any party and as not reasonably calculated to lead to the discovery of admissible evidence."

### Flight Sciences' Position

Flight Sciences has produced over 4,000 pages of material, but Cathay Pacific has produced only 1,129 pages of material. Flight Sciences needs the substantial assistance of this Court to require Cathay Pacific to produce the material that it ought to produce. As stated above, the rules of discovery, and not Cathay Pacific's unilateral views regarding whether it agrees or disagrees with the claims against it, are what control.

First, the above referenced Requests are directly relevant to Flight Sciences' claims and the computation of its damages. Indeed, if this were not evident enough from the pleadings (and it is), *Cathay Pacific* has proffered discovery requests demonstrating the relevance of the requests. For example, *Cathay Pacific's* Interrogatory No. 17 to Flight Sciences demonstrates (as Flight Sciences certainly agrees) that discovery concerning Cathay Pacific's fuel savings (*i.e.*, the price of fuel multiplied by consumption of fuel as measured in connection with certain proposed or actual fuel saving recommendations) is proper. Thus, *Cathay Pacific's* Interrogatory No. 17 reads:

> The Fuel Conservation Consulting Agreement between CATHAY PACIFIC and plaintiff provides that "Flight Sciences will produce recommendations that will achieve quantifiable, measurable fuel conservation benefits of 3% or more of CATHAY PACIFIC's fuel consumption in the first year after the Project completion. If the quantifiable benefits agreed with CATHAY PACIFIC, when measured, fail to achieve net savings of 3% per annum, then [. . .] all further obligations under the Agreement [. . .] shall cease." *Did any or all of the recommendations by plaintiff to CATHAY PACIFIC achieve a 3% savings in order for the plaintiff to receive compensation under the terms of the Fuel Conservation Agreement?* (emphasis added).

The question, ironically, involves precisely the kinds of areas as to which Cathay Pacific simultaneously *refuses* to make disclosure. Cathay Pacific's Interrogatory No. 19 similarly requests "all documents, including payment receipts, which evidence, concern, or relate to the recommendation(s) that achieved 3% savings as specified in the Fuel Conservation Consulting Agreement."[5]

---

[5]    Similarly, Cathay Pacific's Interrogatory No. 3 reads: "State all facts and identify all documents which support the allegation set forth in the Complaint that 'CATHAY PACIFIC has materially breached the Agreement by its failure to pay the contractually specified percentage of fuel cost savings enjoyed by CATHAY PACIFIC and its majority owned subsidiaries." It is Cathay Pacific that has that information at this time, not Flight Sciences, and it is Cathay Pacific that must produce it.

**PROSKAUER ROSE LLP**

Hon. Victor Marrero
September 24, 2007
Page 8

Hence, as regards Flight Sciences' Request No. 8, for example, it cannot be disputed that discovery of the price of fuel paid by Cathay Pacific is relevant (or reasonably calculated to lead to the discovery of admissible evidence) because it is the only way that the jury, Court and parties can quantify the precise amount of agreed, projected, or actual percent of savings, central items to the Agreement. Without disclosure of such information regarding fuel prices it is impossible to determine projected and/or actual savings achieved based on the recommendations provided by Flight Sciences to Cathay Pacific (or otherwise purportedly obtained by Cathay Pacific through other sources or previously known to it, *see* below). The information is critical.[6]

Next, regarding Request No. 10, on the consumption side of the equation (price x consumption = savings), information concerning the fuel consumption of Cathay Pacific and its subsidiaries is equally central to the litigation. The Agreement, after all, talks directly about "consumption of fuel", as reproduced above, for example, in Cathay Pacific's Interrogatory 17. Additionally, Cathay Pacific has also designated a 30(b)(6) witness regarding this subject.[7]

Additionally, Requests Nos. 13-18 relate to fuel conservation strategies considered or implemented by Cathay Pacific, and the savings they could achieve or did achieve.[8] Indeed, just a few months ago Cathay Pacific publicly touted a 20% improvement in fuel efficiency since it commenced its relationship with Flight Sciences. As with respect to Requests Nos. 8 and 10, it is impossible to try this case without the requested information. Cathay Pacific cannot take the position either that it did not use any of Flight Sciences' recommendations, or that the fuel conservation measures that it implemented since the Agreement (which resulted in such substantial savings) were the result of information that it was aware of before the Agreement[9] or

---

[6]   Further, Cathay Pacific agreed to produce a 30(b)(6) deponent regarding fuel prices (*see* ¶ 18 of Flight Sciences' Rule 30(b)(6) deposition notice, and Cathay Pacific's letter dated Sept. 7, 2007, designating its Rule 30(b)(6) witnesses) but that deponent cannot possibly answer questions about fuel prices without documents, nor effectively be questioned or cross examined without production of the documents.

[7]   As far as the time period, Flight Sciences is entitled to documents from a reasonable period prior to the Agreement (*i.e.*, 5 years) in order to ascertain Cathay Pacific's fuel costs and fuel efficiency prior to its contractual relationship with Flight Sciences, which, in turn, are directly relevant to measuring the benefits achieved by Cathay Pacific as a *result of* its relationship with Flight Sciences.

[8]   Similarly, Cathay Pacific objected to Flight Sciences' Interrogatory No. 10 – which requested that Cathay Pacific "Describe in detail each fuel conservation strategy (including but not limited to the Flight Sciences Proposals) considered by CPAL from April 1, 1992 to the present..." – to the extent "it seeks information beyond the claims asserted by plaintiff in this lawsuit" (and even with respect to the Flight Sciences Proposals, Cathay Pacific pointed to a mere 51 pages of documents as their response). For the same reasons set forth below, Cathay Pacific should be compelled to respond in full to this Interrogatory.

[9]   It should be noted that the Agreement does not carve out an exception for such allegedly pre-existing knowledge; but in any event this issue, if pressed by Cathay Pacific, is beyond the scope of this letter, other than to reinforce the appropriateness of the discovery related thereto.

**PROSKAUER ROSE LLP**

Hon. Victor Marrero
September 24, 2007
Page 9

internally generated after the agreement, and then refuse to disclose such information, including the specific fuel conservation measures considered and/or adopted since the Agreement, and the savings it achieved thereto – particularly where, as here, the record demonstrates that Cathay Pacific has, at least in two separate instances, taken Flight Sciences' suggestions and wrongfully claimed them as its own. (*See, e.g.,* Complaint ¶¶ 36-39).[10]

Of course, a principal issue here is precisely that Cathay Pacific seemingly claims that the proposals made by Flight Sciences (called "FSI" in Cathay Pacific's internal emails) are things that Cathay Pacific was essentially "going to do anyway," and, as noted above, in fact did. Capt. Turner of Cathay Pacific candidly admitted this in an email just recently produced by Cathay Pacific, bearing Bates No. CP000598, when he wrote to a colleague in September, 1997 (five months after the Agreement was signed):

> *[T]he legal contract with FSI is quite binding on us – and rightly so. From FSI's point, there is obviously a risk that the customer will listen to what they have to say – and then claim they were going to do that anyway.*

Similarly, in July, 1997, Capt. Turner, responding to a question by another Cathay Pacific employee about the Agreement with Flight Sciences, stated the question Cathay Pacific was wrestling with was "[d]o we try and claim credit for ideas which we may have had but haven't yet developed or haven't got around to doing?" (CP000309). That is an eloquent expression, in fact, of what later happened as far as we can tell based on the limited discovery to date. Hence, now Cathay Pacific either argues that it was going to do the Flight Sciences recommendations anyway, or that it came up with the ideas itself after the fact – anything, in fact, but owning up to the reality that Cathay Pacific took Flight Sciences's ideas without compensation.

Indeed, the limited documents produced thus far demonstrate a dialogue within Cathay Pacific – bordering on a dispute -- regarding the Agreement. Apparently several employees were concerned that the Agreement covered fuel conservation strategies that they felt Cathay Pacific already "knew about" or was "talking about" (at least in part), and some at Cathay Pacific wanted to try to avoid paying in connection with any such matters regardless of the language of the Agreement. Thus, in correspondence after the Agreement was executed, Capt. Turner wrote to some concerned employees: "I intended to put out a circular to all dept. heads today, but time got away from me – to the effect that ANY fuel conservation ideas which have been lurking around for a while but not implemented, MUST be in manuals by the end of June – which is

---

[10]    Once again, the discovery propounded by Cathay Pacific goes to the very same areas as to which Cathay Pacific now purports to object. For example, Interrogatory No. 23 requests that Flight Sciences "State each fuel saving recommendation made by FLIGHT SCIENCES to CATHAY PACIFIC pursuant to the Fuel Conservation Consulting Agreement" and Interrogatory No. 24 says "With respect to each such fuel saving recommendation stated in response to Interrogatory number 23, please state which recommendation was accepted or rejected by CATHAY PACIFIC and the date on which each recommendation was accepted or rejected."

PROSKAUER ROSE LLP

Hon. Victor Marrero
September 24, 2007
Page 10

when [Flight Sciences] start[s] looking at what we do. ***In that way we can pre-empt as much as possible.***" (*See* CP000360; emphasis supplied). Thus, the question of what ideas were "lurking around" is discoverable.

Tying this all together, in fact, Cathay Pacific has put squarely at issue as an affirmative defense that Flight Sciences' recommendations were allegedly "already known" to Cathay Pacific. Cathay Pacific's Sixth Affirmative Defense (Answer ¶ 68) claims that "[t]he recommendations and material forwarded by plaintiff to defendant Cathay Pacific pursuant to the Agreement were in the public domain, were widely known and recognized in the aviation industry and did not constitute any proprietary or trade secret materials."

Flight Sciences is thus accordingly entitled to discovery regarding the extent to which such recommendations provided to Cathay Pacific were purportedly already known and/or considered, or implemented by Cathay Pacific prior to its receipt of the recommendations from Flight Sciences. At the end of the day, how much fuel Cathay Pacific has or could have saved, and how it was or could have been saved, is what the case is about.

## Cathay Pacific's Position

1.    Cathay Pacific objects to each of these requests on the ground that they are overly broad in scope. Plaintiff requests materials that pre-date the parties' contractual relationship. Plaintiff should limit its request to documents dated 1997 to 2006 and only with respect to recommendations which were rejected by Cathay Pacific in 1999 and were later adopted by Cathay Pacific, *i.e.*, the use of lighter weight cargo containers and the "polish" rather than "painting" of aircraft surfaces. Savings for fuel sufficient to trigger liability under the Agreement were based on the fuel price of 78.05 cents per gallon as agreed by the parties in 1997. Since those fuel savings targets were not met with respect to the accepted recommendations, no other fuel prices for subsequent years were discussed between Flight Sciences, Inc. and Cathay Pacific.

### Request No. 18:

**The current flight crew operating manuals for each type of aircraft operated by CPAL or its subsidiaries.**

Cathay Pacific objected to this Request using the same objection set forth above.

## Flight Sciences' Position

As stated in detail above, the acceptance, rejection, and implementation of Flight Sciences' recommendations is relevant. Access to the flight crew operating manuals – which contain detailed information including specific fuel conservation measures utilized by Cathay

PROSKAUER ROSE LLP

Hon. Victor Marrero
September 24, 2007
Page 11

Pacific – is appropriate.  Indeed, the request is quite specific, in that these manuals are the very place that one would find the detailed information concerning the operational fuel conservation measures utilized by Cathay Pacific – if there were any doubt on the point (and there should be none), it is negated by the very words of Captain Turner above (at p. 10), expressly referencing the inclusion of fuel efficiency measures that had allegedly been "lurking around" *in Cathay Pacific's manuals.* (*See* CP000360).

## Cathay Pacific's Position

Counsel objects because this request seeks material not reasonably expected to yield information relevant to the allegations in the Complaint.

### Request No. 19:

**Each document concerning the discussions, deliberations, considerations and recommendations, of each committee, board, group, or division of CPAL or its subsidiaries, including any "Fuel Steering Committee," charged with responsibility for fuel conservation or purchasing issues.**

### Request No. 20:

**Each document concerning the "Airline Weight Task Force," referenced in CPAL's press release of May 17, 2006, at www.cathaypacific.com, including each "staff suggestion" received by said Task Force.**

Cathay Pacific objected to this Request using the same objection set forth above.

## Flight Sciences' Position

Similar to the discussion regarding the first group of Requests, above, these Requests directly relate to Cathay Pacific's consideration and purported acceptance or rejection of fuel conservation strategies, and savings projected, including for Flight Sciences' recommendations, during the relevant time period, and thus are directly discoverable in this litigation for all the reasons set forth above.  Put succinctly, Cathay Pacific cannot on the one hand argue that it derived fuel savings through its own conduct and not the ideas or proposals of Flight Sciences, and simultaneously refuse to provide the information allegedly relating to its assertion.[11]  Indeed, the documents reveal that the Fuel Steering Committee, among other things, discussed the Flight Sciences proposals on several occasions!

---

[11]    Moreover, Cathay Pacific has designated 30(b)(6) witnesses for these categories.  (*See* ¶¶ 23-24 of Flight Sciences' Rule 30(b)(6) deposition notice, and Cathay Pacific's letter dated Sept. 7, 2007, designating its Rule 30(b)(6) witnesses)

**PROSKAUER ROSE LLP**

Hon. Victor Marrero
September 24, 2007
Page 12

Moreover, despite purportedly objecting to producing these documents, the limited additional production made by Cathay Pacific on September 7, 2007 included documents responsive to both Requests. Cathay Pacific produced certain meeting minutes and agendas from the Fuel Steering Committee (but only for a limited time period), as well some suggestions received by this Task Force, including suggestions regarding removing excess paint from the aircraft – which was one of Flight Sciences' specific recommendations that was purportedly rejected by Cathay Pacific (but later implemented). However, it does not appear that Cathay Pacific has produced all of the meeting minutes and agendas from the Fuel Steering Committee, nor does it appear that is has produced all documents related to the "Airline Weight Task Force."

### Cathay Pacific's Position

Response to Request No. 19: Cathay Pacific raises the same objection with respect to relevancy. Cathay Pacific has provided minutes of the Fuel Steering Committee for 1998 and 1999, when the recommendations made by Flight Sciences pursuant to the Agreement were under consideration by Cathay Pacific. Moreover, some of the Fuel Steering Committee minutes since 1999 refer to Cathay Pacific's corporate strategy for purchasing and hedging of fuel prices, commercially sensitive issues which have nothing to do with the issues in this case.

Cathay Pacific has produced a summary of the staff suggestions received by the Task Force and has produced the staff suggestions concerning the "polish" versus "paint" issue on aircraft finishes.--

### Request No. 22:

**Each CPAL press release or other public statement concerning the fuel consumption or fuel conservation of CPAL and its subsidiaries.**

Cathay Pacific objected to this Request using the same objection as set forth above.

### Flight Sciences' Position

Fuel consumption and conservation is what the Agreement, and this case, are about, as above. Further, the requested information is presumably in the public record (although in this instance vastly more easily retrievable by Cathay Pacific than Flight Sciences) and thus is no way objectionable on grounds of sensitivity. Additionally, Cathay Pacific has designated a 30(b)(6) witness for this area. (See ¶ 26 of Flight Sciences' Rule 30(b)(6) deposition notice, and Cathay Pacific's letter dated Sept. 7, 2007, designating its Rule 30(b)(6) witnesses). The documents are discoverable, as well, for all of the reasons set forth above.

### Cathay Pacific's Position

**PROSKAUER ROSE LLP**

Hon. Victor Marrero
September 24, 2007
Page 13

Counsel objects on the ground that this request is too broad in scope and is not limited to plaintiff's suggestions. It is not reasonable to ask Cathay Pacific to provide each of its press releases concerning fuel conservation without a specific time limitation. There is no reason why Cathay Pacific should provide Flight Sciences with any press release dated prior to 1997, when the parties signed the Agreement, or after 1999 when the fuel recommendations prepared by Flight Sciences were accepted or rejected by Cathay Pacific.

    **Request No. 23:**

    **Each document concerning the website located at www.flightsciences.com.**

    Cathay Pacific objected to this request as "incomprehensible."

### Flight Sciences' Position

    This Request simply seeks each document in Cathay Pacific's custody, possession, and control which relates to Flight Sciences' website, where the reference to Cathay Pacific appears, and as to which Cathay Pacific has raised a Counterclaim. Thus, the information contained on Flight Sciences' website, and Cathay Pacific's awareness of such information, is directly relevant to, among other things, Cathay Pacific's Counterclaim and Flight Sciences' affirmative defenses thereto (as to which Cathay Pacific itself, we note, has requested discovery from Flight Sciences).

### Cathay Pacific's Position

Counsel objects to this request on the ground that it is so vague, broad, general and all inclusive that does not permit a proper or reasonable response and is, therefore, unduly burdensome and oppressive. There is no reason why Cathay Pacific is obligated to provide documents concerning plaintiff's website. Plaintiff should already be in possession of all the documents related to its own website.

    **Request No. 25:**

    **Each document concerning CPAL's denial of the Complaint's allegation at paragraph 6 that CPAL has an interest in other carriers, including Hong Kong Dragon Airlines Limited and Air Hong Kong Limited.**

    **Request No. 26:**

    **Documents sufficient to show the identity of any majority owned subsidiary carriers of CPAL, and the percentage of CPAL's direct or indirect ownership interest, from**

PROSKAUER ROSE LLP

Hon. Victor Marrero
September 24, 2007
Page 14

>January 1, 1997 to the present.

Cathay Pacific objected to these Requests using its objections as set forth above.

### Flight Sciences' Position

Despite agreeing to produce information concerning Cathay Pacific's subsidiaries in several other Requests to which Cathay Pacific agreed to produce responsive documents (for example, Request Nos. 11 and 12), Cathay Pacific has not provided any information related to its subsidiaries (in connection with any of its responses). It must do so.

First, as a practical matter, the denial that Cathay Pacific has an interest in other carriers appears inaccurate and is in part what triggered request No. 25. In any event, assuming that can be cleared up rather quickly and Cathay Pacific changes its inaccurate denial, Cathay Pacific should have documents readily available that are "sufficient to show" its interest in other carriers, if any, and there is no reason why this information should not be disclosed.

This is relevant on the global level, affecting all discovery, because subsidiaries *are part of the Agreement* – the Agreement explicitly references Cathay Pacific's subsidiaries at paragraph 14.2: "Cathay Pacific agrees that all information and reports which Cathay Pacific may acquire in connection with this Agreement or pursuant to the Project are for *the sole and exclusive use of Cathay Pacific and its majority owned subsidiaries*…" (emphasis added). Because Cathay Pacific's subsidiaries are specifically referred to in the Agreement as intended "users" of the information and reports provided by Flight Sciences to Cathay Pacific, they are obviously relevant to the computations herein and the requested information is discoverable, in all instances, from Cathay Pacific and its subsidiaries. (*See, e.g.,* Complaint ¶ 45).

### Cathay Pacific's Position

Cathay Pacific has now confirmed that it does have ownership interests in both Hong Kong Dragon Airlines Limited and Air Hong Kong Limited. Cathay Pacific admits the allegations in paragraph 6 of the Complaint and the documents sought in Requests 25 and 26 are not relevant.

### PARTIAL OR INCOMPLETE PRODUCTION

### Flight Sciences' Position

Based on a review of the documents produced to date, Flight Sciences believes Cathay Pacific has not sufficiently produced documents in response to several Requests for which Cathay Pacific stated that it would produce responsive documents. Indeed, Cathay Pacific has either not produced any documents, or has not produced sufficient documents for the following

PROSKAUER ROSE LLP

Hon. Victor Marrero
September 24, 2007
Page 15

requests[12]:

> **Request No. 1:**
>
> **Each document concerning Flight Sciences.**
>
> **Request No. 2:**
>
> **Each document concerning the Agreement.**
>
> **Request No. 3:**
>
> **Each document concerning the Flight Sciences Proposals.**
>
> **Request No. 4:**
>
> **Each document concerning the implementation (whether modified or not) of any of the Flight Sciences Proposals by CPAL or its subsidiaries.**
>
> **Request No. 9:**
>
> **Each document concerning the approximately 20% improvement in "fuel efficiency" since 1998, referenced in CPAL's press release dated March 29, 2007 and available at www.cathaypacific.com.**
>
> **Request No. 11:**
>
> **Each document concerning the savings achieved by implementation of the Flight Sciences Proposals by CPAL and its subsidiaries for each year from October 1, 1997 to the present, regardless of when any such Proposal(s) were or was implemented.**
>
> **Request No. 12:**
>
> **Each document concerning the savings, if any, projected (by any party) for proposed Flight Sciences Proposals that were not implemented by CPAL or its subsidiaries from October 1, 1997 to the present.**

---

[12]    To the extent Cathay Pacific represents that it does not possess any additional non-privileged documents responsive to the Requests discussed below, Flight Sciences has offered to work out some kind of representation that would confirm this to Flight Sciences' reasonable satisfaction. Instead, Cathay Pacific has stated that it may or may not have found and produced all documents, without explaining how searches were conducted.

PROSKAUER ROSE LLP

Hon. Victor Marrero
September 24, 2007
Page 16

### **Flight Sciences' Position**

By way of example, although agreeing to do so, Cathay Pacific has not produced documents sufficient to establish the savings achieved by implementation of Flight Sciences' recommendations, nor the projected savings for each recommendation that was not implemented, for each year from October 1, 1997 to the present. Indeed, as far as Flight Sciences can tell, the only documents produced by Cathay Pacific were documents concerning Cathay Pacific's initial consideration of Flight Sciences' recommendations (CP 000009 – CP 000062). Cathay Pacific has not produced any documents concerning the projected and/or actual savings achieved by implementation of any of Flight Sciences' recommendations for each year from 1997 to the present (including recommendations that Cathay Pacific purported to reject but later implemented). Cathay Pacific states it has done a "search" but does not explain the search, and apparently believes there is a good chance more material will show up. This is not a comfortable way to proceed. Under these circumstances, Cathay Pacific should, at a minimum, detail the search it has done.

### **Cathay Pacific's Position**

Documents responsive to these requests have been produced as CP000001-CP001129.

### **II.**

### **CATHAY PACIFIC'S 30(b)(6) DEPOSITIONS**

### **Flight Sciences' Statement of the Issues**

On August 10, 2007, Flight Sciences served its First Notice of Rule 30(b)(6) Deposition upon Cathay Pacific, noticing the deposition of Cathay Pacific on September 19, 2007, in New York. On September 7, 2007, Cathay Pacific designated multiple individuals as Rule 30(b)(6) representatives for certain categories listed in Flight Sciences' deposition notice. As discussed below, Cathay Pacific also objected to certain categories on the grounds of relevancy and "based on the long time period involved" (Cathay pacific essentially seeks to limit disclosure from 1997 until 2000 or 2001, based on its version of the case – which is improper, as set forth above).

By letter dated September 11, 2007, Flight Sciences inquired whether Cathay Pacific would make any of its designated witnesses available for deposition on September 19, 2007, as noticed. Cathay Pacific responded on September 17, 2007, stating that no witnesses would be made available on September 19. Cathay Pacific further asserted that because its 30(b)(6) witnesses resided outside of the United States (and some are former employees) the depositions "will have to be taken, in accordance with the Federal Rules of Civil Procedure, at the place

PROSKAUER ROSE LLP

Hon. Victor Marrero
September 24, 2007
Page 17

where those witnesses work or reside." (Cathay Pacific is making one of its witnesses available
in New York this week). By letter dated September 18, 2007, Flight Sciences responded that the
most appropriate location for these depositions is New York.

### Cathay Pacific's Statement of the Issues

Cathay Pacific is making available this Friday, September 28, 2007, Captain Jeff Turner, a
retired Cathay Pacific employee, who was most familiar with the terms of the Fuel Conservation
Consulting Agreement. Captain Turner will testify if asked that he retained no documents
following his retirement from the airline in 2002. The documents Cathay Pacific has responsive
to the request to produce served by plaintiff have already been produced in this litigation and are
marked as documents CP000001 to CP001129.

Flight Sciences has requested Cathay Pacific to designate witnesses in thirty-eight separate areas
with respect to this breach of contact action and Cathay Pacific has made the designations on
September 7, 2007. As discussed below, most of these witnesses work and live in Hong Kong,
which is where their deposition should take place. Cathay Pacific has responded to the discovery
requests served by plaintiff on August 24, 2007 and has produced 1139 pages of material
responsive to the request to produce. Cathay Pacific has objected to producing any of the
witnesses in the United States and has also objected to the time frame sought by the Rule
30(b)(6) depositions.

### LOCATION OF DEPOSITIONS

### Flight Sciences' Position

Contrary to Cathay Pacific's representation in its letter of September 17 that the Federal
Rules of Civil Procedure require that the depositions of its witnesses must take place where these
witnesses work or reside, it is well established under the authorities that the location of such
depositions is a matter of discretion. *See e.g., Sugarhill Records LTD. v. Motown Record Corp.*,
105 F.R.D. 166, 171 (S.D.N.Y. 1985).

Although there is, to be sure, a general presumption that corporate defendants are
deposed at the location of their principal place of business, the presumption is accorded little if
any weight where, as here, Plaintiff was constrained in choosing the forum for the litigation by
the presence of an exclusive forum selection clause that effectively constrained both sides to
bring this action in this Court. *See generally In re Livent, Inc. Securities Litigation*, 2002 WL
31366416, at *1 (S.D.N.Y. Oct. 21, 2002) (Marrero, J.) ("Defendants are correct that there exists
a presumption favoring deposition at a defendant's or third-party's residence or place of business;
however, Defendants overlook that it is equally well-settled that this presumption loses its force
in cases where the plaintiff's choice of forum is effectively constrained.") (internal quotation
omitted); *Mill-Run Tours, Inc. v. Khashoggi*, 124 F.R.D. 547, 550 (S.D.N.Y. 1989) ("Because

PROSKAUER ROSE LLP

Hon. Victor Marrero
September 24, 2007
Page 18

courts retain substantial discretion to designate the site of a deposition, the presumption appears
to be merely a decisional rule that facilitates determination when other relevant factors do not
favor one side over the other. Underlying this rule appears to be the concept that it is the
plaintiffs who bring the lawsuit and who exercise the first choice as to the forum. The
defendants, on the other hand, are not before the court by choice. Where this factual premise is
attenuated, the presumption is weakest.") (internal quotation omitted).

Here, ¶ 25.2 of the Agreement provides that in all actions regarding the Agreement, "each
party hereto consent and submits to the exclusive jurisdiction of the Federal Courts in New York
City, New York."[13] Accordingly, the appropriate location for the depositions in this case turns
on considerations of cost, convenience, and litigation efficiency. *See, e.g., In re Livent, Inc.
Securities Litigation*, 2002 WL 31366416, at *1; *Mill-Run Tours*, 124 F.R.D. at 550; *Doe v.
Karadzic*, 1997 WL 45515, at *3 (S.D.N.Y. Feb. 4, 1997). As set forth below, these factors
require the conducting of the depositions in New York.

First, in terms of aggregate cost and convenience, New York is the most appropriate
location for the depositions. Both parties are represented by New York counsel, and all of the
documents produced thus far have been produced in and are available in New York. Moreover,
Cathay Pacific has an office in New York and regularly conducts business in New York. Indeed,
as an airline, Cathay Pacific is particularly able to conveniently fly its witnesses to New York at
minimal, if any, cost. Thus, rather than flying multiple counsel, perhaps other party
representatives, and all of the necessary documents overseas, it is cheapest and most convenient
for each single witness to come to New York for deposition.

Second, the efficiency of the litigation will be furthered by conducting the depositions in
New York. For example, the potential need for judicial supervision of the depositions is a
compelling factor that weighs in favor of conducting the depositions in New York. As evidenced
by the need for this letter, the parties have been unable to resolve certain discovery disputes
without judicial intervention. Because of the potential likelihood of further disagreement during
the depositions, conducting the depositions in New York will enable such disputes to be resolved
on a contemporaneous basis. Indeed, in this case, the time difference with Hong Kong virtually
guarantees that if the witness is deposed during normal business hours in Hong Kong, the Court
in New York will be closed for business (it being the middle of the night or such) and unable to
rule. *See Custom Form Manufacturing, Inc. v. Omron Corp.*, 196 F.R.D. 333, 336 (N.D. In.
2000) (ordering that the depositions of Defendant (a Japanese company) be conducted in the
United States because if the depositions were conducted in Japan, the court's authority to
intervene would be compromised by sovereignty issues as well as distance); *Doe*, 1997 WL
45515, at *3 (recognizing that if defendant's deposition is held overseas, as opposed to New
York, "it will be impossible to resolve such disputes on a contemporaneous basis"); *Mill-Run
Tours*, 124 F.R.D. at 551 (finding that although a judge or magistrate could conceivably resolve

---

[13]     It should also be noted that Cathay Pacific has filed a Counterclaim against Flight Sciences, and thus has
availed itself of the services of this Court.

**PROSKAUER ROSE LLP**

Hon. Victor Marrero
September 24, 2007
Page 19

discovery disputes by telephone, such a procedure is "costly and unwieldy" and thus the depositions should be conducted in New York, which would "accelerate the resolution" of any disputes and "minimize the risk that any deposition [would] be interrupted for a significant period").

Third, the authorities demonstrate that when a foreign corporation is doing business in the United States, is subject to the court's jurisdiction, and has freely taken advantage of our federal rules of discovery, the foreign corporation's agents are frequently compelled for deposition on American soil. *See Custom Form,* 196 F.R.D. at 336 (*citing In re Honda American Motor Co., Inc. Dealership Relations Litigation,* 168 F.R.D. 535, 541-42 (D.Md.1996) (requiring agents of a Japanese corporate defendant to be deposed in Maryland); *M & C Corporation v. Erwin Behr GmbH & Co.,* 165 F.R.D. 65, 68 (E.D.Mich.1996) (requiring a German corporate defendant's agents to appear for depositions in Detroit); *R.F. Barron Corp. v. Nuclear Fields (Australia) Pty., Ltd.,* 1992 WL 212602, *2 (N.D.Ill.1992) (requiring depositions of Dutch and Australian defendants in Chicago); *Roberts v. Heim,* 130 F.R.D. 430, 439-40 (N.D.Cal.1990) (compelling the appearance of a Swiss defendant for deposition in San Francisco)).

Finally, as recognized by the court in *Custom Form,* any differences in the discovery rules between the United States federal rules of discovery and the applicable discovery rules of the applicable foreign jurisdiction weighs in favor of having the depositions conducted in the United States:

> Custom Form argues that defendants' Rule 30(b)(6) designatees should be compelled to travel to the United States because Omron has availed itself of the liberal United States federal rules of discovery throughout the course of this litigation, and therefore in fairness any depositions of the defendants' representatives should take place in the United States so that Custom Form can take advantage of the same liberal rules. Custom Form points out that in Japan a witness cannot be compelled to produce anything, and also notes that Japanese laws forbid an employee, while on Japanese soil, from disclosing any information that its corporate employer may unilaterally label as a trade secrete, even when the employee is under order of a United States Court to make such a disclosure.
>
> In response, Omron labels the plaintiff's arguments as scare tactics; which they contend are unsupported by the record. They further assert that any of the risks associated with the differences between Japanese and United States discovery rules can be averted by stipulations relating to the conduct of the deposition agreed upon in advance of any of the requested depositions.
>
> What defendants' suggestion fails to take into consideration, however, is that if the depositions do take place in Japan, this court's authority to intervene, if it should become necessary, is compromised whether there are stipulations or not. First, the court's authority would be compromised by sovereignty issues if

PROSKAUER ROSE LLP

Hon. Victor Marrero
September 24, 2007
Page 20

depositions took place in Japan, rather than in the United States. "If a federal
court compels discovery on foreign soil, foreign judicial sovereignty may be
infringed, but when depositions of foreign nationals are taken on American or
neutral soil, courts have concluded that comity concerns are not implicated." *In
re Honda American Motor Co., Inc.,* 168 F.R.D. at 538 (citing *In re Anschuetz &
Co.,* 754 F.2d at 608 n. 13). Second, the court's authority is compromised by
distance. Without a federal judge or magistrate in Japan, it would be difficult to
resolve discovery disputes that might arise in this matter. Accordingly, the court
must conclude that the best way to protect the discovery process in this case, and
the best way to avoid sovereignty issues that might otherwise arise, is to compel
that the Rule 30(b)(6) depositions of defendants' employees take place in the
United States.

The Seventh Circuit affirmed a similar conclusion in *Afram Export Corp. v.
Metallurgiki Halyps, S.A.,* 772 F.2d 1358 (7th Cir.1985). There the circuit court
reviewed a district court's decision to compel the president of a Greek steel
corporation to appear for a deposition in either New York or Milwaukee, and it
found that the district court did not abuse its discretion. The court weighed a
number of factors in its decision: the absence of a special showing of hardship on
the part of the Greek company; the time and expense required for the plaintiff to
travel to Greece; and the absence of a federal judge or magistrate in Greece,
making it difficult to rule on objections. The same factors come out in favor of
the plaintiffs in this case, further supporting the court's ruling that the motion to
compel depositions in the United States should be granted.

*Id.* at 336-37.

### Cathay Pacific's Position

None of the Cathay Pacific witnesses in this case, whether they still work for Cathay Pacific or
not (for example, T.C. Wong who resides in Hong Kong, no longer works for Cathay Pacific and
Captain Jeff Turner is now retired in England and South Africa) work in the United States.
Under Rule 26(c), the Court has authority to grant a protective motion for good cause shown to
protect a party or person from undue burden or expense. The general rule is that depositions of a
defendant and its witnesses should be conducted at the place where the witnesses work and
reside. *Bank of N.Y. v. Meridien BIAO Tanzania, Ltd,* 181 F.R.D. 135,155 (S.D.N.Y. 1977);
*Mill Run Tours v. Khaseggi,* 124 F.R.D. 547,550 (S.D.N.Y. 1989). This is particularly true
where the witnesses reside outside the United States. There are no unusual circumstances in this
case that would require forcing employees of Cathay Pacific and, to the extent that they can be
persuaded to voluntarily testify, former employees of Cathay Pacific, to testify other than in
Hong Kong. The airline's principal place of business is there, the documents that have been
produced in this litigation came from Hong Kong, the deponents work and reside in Hong Kong

PROSKAUER ROSE LLP

Hon. Victor Marrero
September 24, 2007
Page 21

or, with respect to non-party deponents, in other countries outside the United States. It would be extremely burdensome and inconvenient to force individuals to travel from Hong Kong to the United States in connection with a case where the discussions between the parties occurred in Hong Kong nearly a decade ago.

The fact that Cathay Pacific is an airline does not shift the burden of the place of conduct of depositions. The witnesses are still located in Hong Kong and the rule is specifically designed to protect the interests of those witnesses who would be required to travel thousands of miles from their home in order to testify in this matter. Because of the time differences between Hong Kong and New York, someone is going to have to be inconvenienced in this case: the question is whether it should be the counsel or the witnesses. Given the fact that none of the witnesses work or reside in New York or indeed anywhere else in the United States, the attorneys should be the ones required to travel to Hong Kong to conduct the depositions of the witnesses there. Given the large number of witnesses that plaintiff will presumably request to depose, it would be extremely burdensome for the corporation to disrupt its operations by bringing a parade of witnesses to New York to testify in this case. It will be quicker and simpler for counsel to simply go to Hong Kong, conduct whatever depositions they desire and return to New York.

Plaintiff is fortunate to be represented by one of the nation's largest law firms, who have the experience and expertise to travel to the Far East to conduct these depositions. *See, e.g., Six West Retail Acquisition, Inc. v. Sony Theatre Management Corp.*, 203 F.R.D. 98, 108 (S.D.N.Y. 2001) (directing that depositions of corporate executives of defendant take place in Japan, where the witnesses worked and resided in view of seasoned litigators representing the plaintiffs); *Federal Deposit Insurance Co. v. La Antillana, S.A.*, No. 88-2670, 1900 WL 155727, *1 (S.D.N.Y. 1990). A plaintiff may only overcome this presumption by showing "peculiar" circumstances favoring depositions at a different location. *Six West, supra,* at 107 (S.D.N.Y. 2001). No such circumstances exist in this case.

As an alternative, Cathay Pacific has advised plaintiff's counsel that Cathay Pacific has videoconference facilities available in Hong Kong and would be willing to produce its employees for videoconference depositions there, thus obviating the necessity for plaintiff's counsel to travel to Hong Kong to conduct the depositions. Cathay Pacific remains willing to make its employees available by videoconference during their normal working hours in Hong Kong.

## CATHAY PACIFIC'S OBJECTIONS

### Flight Sciences' Position

Cathay Pacific has objected to the following Rule 30(b)(6) topics on the grounds of relevance, and therefore refused to designate a corporate representative:

**PROSKAUER ROSE LLP**

Hon. Victor Marrero
September 24, 2007
Page 22

> **32.**    **Current flight crew standard operating procedures for each type of aircraft operated by CPAL or its subsidiaries.**

> **38.**    **CPAL's majority owned subsidiary air carriers from January 1, 1997 to the present.**

As set forth in detail above (at pp. 9, 11-12), these topics are directly relevant to the claims in this litigation, and thus Cathay Pacific should be compelled to produce a corporate representative that can adequately discuss each topic. "Standard operating procedures" specifically are akin to manuals, *i.e.,* they will reveal what fuel conservation strategies are in effect at the operational level.

In addition, Cathay Pacific has fully or partially objected to the following Rule 30(b)(6) topics on the purported grounds that "there is too long a time period involved" or that the topic is "overbroad."

> **16.**    **Fuel conservation strategies considered by CPAL or its subsidiaries from April 1, 1992 to the present (regardless of whether such strategies were implemented, modified from other strategies, accepted, rejected or remain under consideration) and the reason or reasons that each such strategy was implemented, modified, accepted, rejected, or remains under consideration (including the rejections as alleged in Answer ¶¶ 32, 34).**

> **19.**    **Savings achieved by implementation of the Flight Sciences Proposals and any other fuel conservation strategies by CPAL and its subsidiaries for each year from April 1, 1992 to the present, with respect to each such strategy or Proposal.**

> **22.**    **Each proposal, analysis or recommendation for fuel conservation prepared by, or for, CPAL or its subsidiaries from April 1, 1992 to the present, not prepared by Flight Sciences.**

> **23.**    **Each committee, board, group, or division of CPAL or its subsidiaries, including but not limited to any "Fuel Steering Committee," charged with responsibility for fuel conservation or purchasing issues.**

> **26.**    **Each CPAL press release or other public statement concerning the fuel consumption or fuel conservation of CPAL or its subsidiaries.**

As set forth in detail above (at pp. 10-13), this information is directly relevant to the claims asserted by Flight Sciences in its Complaint, as well as the affirmative defenses raised by Cathay Pacific in its Answer.   In terms of the objection of time period, Flight Sciences is entitled to discover information related to Cathay Pacific's fuel consumption and conservation strategies

**PROSKAUER ROSE LLP**

Hon. Victor Marrero
September 24, 2007
Page 23

and savings for a reasonable period prior to the Agreement (*i.e.,* 5 years), since Cathay Pacific
has asserted as an affirmative defense that the recommendations provided to it by Flight Sciences
were in the public domain, and we now know that Cathay Pacific was trying to amass strategies
that were allegedly "lurking" for a while, in order to try to "pre-empt" Flight Sciences (above at
p. 10). In other words, Cathay Pacific cannot on the one hand assert that it had previous internal
knowledge of the information provided to it by Flight Sciences – and thus argue that Flight
Sciences should not be compensated for any savings achieved based on this information (even
though the Agreement, we note, gives no such right to Cathay Pacific) – and on the other hand
refuse to produce this information.

Moreover, the disclosure needs to go to the present – as demonstrated in Flight Sciences'
Complaint (¶¶ 36-39), only last year Cathay Pacific for the first time publicly announced it was
adopting two of the strategies it had purportedly rejected -- Flight Sciences is entitled to all
information relating to Cathay Pacific's fuel consumption and conservation strategies and
savings from the time of the Agreement through the present, such that it can determine what
savings achieved by Cathay Pacific are attributable to Flight Sciences' recommendations. Since
only Cathay Pacific – not Flight Sciences – knows the extent to which Flight Sciences'
recommendations have been implemented, and what discussion was had (or is being had) about
them, it should be compelled to produce this information.

### Cathay Pacific's Position

The discovery should be limited to issues raised in the Complaint with respect to fuel
recommendations that were rejected in 1999 but later adopted by Cathay Pacific and to which
Flight Sciences believed they are entitled to compensation. Requests before execution of the
Agreement in 1997 or after the recommendations were accepted in 1999 are irrelevant to issues
raised in the Complaint.

**PROSKAUER ROSE LLP**

Hon. Victor Marrero
September 24, 2007
Page 24

The parties thank your Honor for your time and consideration.

Respectfully,

Hank L. Goldsmith

**JOINTLY SUBMITTED:**

Michael Holland, Esq.
Condon & Forsyth

cc:    (by email, w/o enclosures)
       Arthur C. Chambers, Esq.
       Roberta Vassallo, Esq.
       Roderick D. Margo, Esq.

The parties are directed to address the matter set forth above to Magistrate Judge Frank Maas, to whom this dispute has been referred for resolution, as well as for supervision of remaining pretrial proceedings, establishing case management schedules as necessary, and settlement.

SO ORDERED.

9-25-07
Date

VICTOR MARRERO, U.S.D.J.